**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re Insider Inc. Pixel- VPPA Litigation* | Case No. 1:22-cv-06529-AT |
| | Judge: Hon. Analisa Torres |


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S**
**MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 5

    A.   Insider's Services and Website. ...................................................................... 5

    B.   Facebook's Data Collection Practices and Disclosures. .................................. 6

    C.   The Named Plaintiffs. ..................................................................................... 8

ARGUMENT ........................................................................................................................ 9

I.    THE VPPA CLAIM FAILS BECAUSE INSIDER IS NOT A VIDEO TAPE
SERVICES PROVIDER SUBJECT TO LIABILITY UNDER THE ACT ......................... 10

    A.   The VPPA Applies Only to Providers Who Deliver Video Content "Similar"
to Pre-Recorded Video Tapes, Which Insider Does Not. ................................ 11

    B.   Insider Is Likewise Not "Engaged In the Business" of Delivering Pre-Recorded
Video Tapes or Similar Materials. .................................................................. 16

II.   THE VPPA CLAIM FURTHER FAILS BECAUSE INSIDER HAS NOT
DISCLOSED PERSONALLY IDENTIFABLE INFORMATION. ..................................... 18

    A.   Transmission of A Facebook ID to Facebook Is Not A "Disclosure." ........... 19

    B.   Facebook Cookies are not PII. ....................................................................... 20

    C.   Insider Has Not Disclosed "Specific Video Materials or Services." .............. 22

III.  THE PLAINTIFFS ARE NOT "CONSUMERS" UNDER THE VPPA. ........................... 25

IV.  ANY DISCLOSURES INSIDER MADE WERE NOT MADE "KNOWINGLY." ............ 29

V.   PLAINTIFFS' CLAIM FOR UNJUST ENRICHMENT ALSO FAILS. ........................... 30

CONCLUSION .................................................................................................................. 30

## TABLE OF AUTHORITIES

**Cases**                                                                                               **Page(s)**

*Airbnb, Inc.* v. *City of New York*,
    373 F. Supp. 3d 467 (S.D.N.Y. 2019) ...................................................................................20

*Aldana* v. *GameStop, Inc.*,
    1:22-cv-7063-LTS, ECF 1 (S.D.N.Y. Aug. 18, 2022)............................................................15

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009)...........................................................................................................9-10

*Austin-Spearman v. AMC Network Entertainment LLC*,
    98 F. Supp.3d 662 (S.D.N.Y. 2015).................................................................................27-28

*Bell Atl. Corp.* v. *Twombly*,
    550 U.S. 544 (2007)................................................................................................................9

*Bernardino* v. *Barnes & Noble Booksellers, Inc.*,
    No. 17CV04570-LAK-KHP, 2017 WL 3727230 (S.D.N.Y. Aug. 11, 2017).........................22

*Carroll* v. *Chik-Fil-A, Inc.*,
    3:23-cv-314-LJC, ECF 1 (N.D. Cal. Jan. 22, 2023) .............................................................15

*Charles* v. *Orange Cnty.*,
    925 F.3d 73 (2d Cir. 2019)......................................................................................................9

*Czarnionka* v. *Epoch Times Ass'n*,
    22 Civ. 6348-AKH, 2022 WL 17069810 (S.D.N.Y. Nov. 17, 2022) ....................................22

*DPWN Holdings (USA), Inc.* v. *United Air Lines, Inc.*,
    747 F.3d 145 (2d Cir. 2014)....................................................................................................9

*Dunlop Tire & Rubber Corp.* v. *Interstate Commerce Comm'n*,
    724 F.2d 349 (2d Cir. 1983) (per curiam)..............................................................................11

*Eichenberger* v. *ESPN, Inc.*,
    876 F.3d 979 (9th Cir. 2017) ...........................................................................................15, 20

*Ellis* v. *Cartoon Network, Inc.*,
    803 F.3d 1251 (11th Cir. 2015) .....................................................................................26-27, 28

*F.D.I.C.* v. *Dye*,
    642 F.2d 833 (5th Cir. Unit B 1981)......................................................................................19

*Green* v. *Dep't of Educ. of N.Y.*,
    16 F.4th 1070 (2d Cir. 2021) ..................................................................................................9

*In re DoubleClick Inc. Priv. Litig.*,
   154 F. Supp. 2d 497 (S.D.N.Y. 2001) ..................................................................7, 30

*In re Hulu Priv. Litig.*,
   C 11-03764-LB, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) ...........................7, 21

*In re Hulu Priv. Litig.*,
   86 F. Supp. 3d 1090 (N.D. Cal. 2015) ................................................18, 20, 25, 29

*In re Hulu Privacy Litigation*,
   C 11-03764 LB, 2012 WL 3282960 (N.D. Cal. Aug. 10, 2012) ............................14

*In re Nickelodeon Consumer Privacy Litig.*,
   827 F.3d. 262 (3d Cir. 2016).......................................................................... 17, 20-21

*In re Vizio, Inc., Consumer Priv. Litig.*,
   238 F. Supp. 3d 1204 (C.D. Cal. 2017) ........................................... 14, 16, 25-26

*Kane ex rel. United States* v. *Healthfirst, Inc.*,
   120 F. Supp. 3d 370 (S.D.N.Y. 2015)....................................................................15

*Kline* v. *Department of H.H.S.*,
   927 F.2d 522 (10th Cir. 1991) ................................................................................19

*Lebakken v. WebMD, LLC*,
   1:22-CV-644-TWT, 2022 WL 16716151 (N.D. Ga. Nov. 4, 2022) ......................28

*Martin* v. *Meredith Corp.*,
   1:22-cv-4776-DLC, ECF 1 (S.D.N.Y. June 7, 2022) ...........................................15

*Martin* v. *Meredith Corp.*,
   22-cv-04776-DLC, 2023 WL 2118074 (S.D.N.Y. Feb. 17, 2023)...............................3, 23, 25

*McMillian* v. *Amazon.com, Inc.*,
   983 F.3d 194 (5th Cir. 2020) ........................................................................... 16-17

*Melendez* v. *City of N.Y.*,
   16 F.4th 992 (2d Cir. 2021) ......................................................................................9

*Mollett* v. *Netflix, Inc.*,
   2012 WL 3731542 (N.D. Cal. Aug. 17, 2012) ......................................................29

*Nelson* v. *MillerCoors, LLC*,
   246 F. Supp. 3d 666 (E.D.N.Y. 2017) ...................................................................30

*Nicosia* v. *Amazon.com, Inc.*,
   834 F.3d 220 (2d Cir. 2016).....................................................................................3

*Pellerin* v. *Veterans Admin.*,
    790 F.2d 1553 (11th Cir.1986) ............................................................................19

*Perry* v. *Cable News Network, Inc.*,
    854 F.3d 1336 (11th Cir. 2017) ............................................................ 26-27, 28

*Quinn* v. *Stone*,
    978 F.2d 126 (3d Cir. 1992)...................................................................................19

*Ramirez* v. *Military Advantage, Inc.*,
    1:22-cv-10892-WYG (D. Mass. June 8, 2022).........................................................15

*Reyes* v. *Supervisor of D.E.A.*,
    834 F.2d 1093 (1st Cir. 1987)...............................................................................19

*Robinson* v. *Disney Online*,
    152 F. Supp. 3d 176 (S.D.N.Y. 2015)............................................................... 20-21

*Soto* v. *Disney Severance Pay Plan*,
    26 F.4th 114 (2d Cir. 2022) .................................................................................10

*Springfield Hosp., Inc.* v. *Guzman*,
    28 F.4th 403 (2d Cir. 2022) ..........................................................................11, 13

*Stark* v. *Patreon*,
    3:22-cv-03131-JCS, ECF 49-1 (N.D. Cal. Dec. 5, 2022) .................................10, 17

*Stark* v. *Patreon, Inc.*,
    22-cv-03131-JCS, 2023 WL 2090979 (N.D. Cal. Feb. 17, 2023) ....................12, 17

*U.S. Commodity Futures Trading Comm'n* v. *Byrnes*,
    13-cv-1174-VSB, 2019 WL 4515209 (S.D.N.Y. Sept. 19, 2019) ................... 14-15

*United States* v. *DiCristina*,
    726 F.3d 92 (2d Cir. 2013)............................................................................ 11-12

*United States* v. *Rigas*,
    2008 WL 144824 (S.D.N.Y. Jan. 15, 2008) ........................................................19

*United States* v. *Stanko*,
    491 F.3d 408 (8th Cir. 2007) ..............................................................................13

*United States* v. *W.R. Grace & Co.*,
    166 F. 748 (2d Cir. 1909) ............................................................................ 13-14

*Wilson* v. *Triller, Inc.*,
    598 F. Supp. 3d 82 (S.D.N.Y. 2022)............................................................ 18, 20-21

*Yershov* v. *Gannett Satellite Information Network, Inc.*,
820 F.3d 482 (1st Cir. 2016) ............................................................................27, 28

**Statutes**

18 U.S.C. § 2710(a) ............................................................................ *passim*

18 U.S.C. § 2710(b) ............................................................................10, 29

18 U.S.C § 2710(c) ............................................................................9

**Rules**

Fed. R. Civ. P. 8(a)(2) ............................................................................10

Fed. R. Civ. P. 12(b)(6) ............................................................................9

**Legislative Materials**

S. Rep. 100-599 (1988) ............................................................................12, 14, 26

**Other Authorities**

Black's Law Dictionary (Garner 8th ed. 2004) ............................................................................19

Facebook Cookie Policy (Oct. 5, 2022),
https://m.facebook.com/policy/cookies/printable/ ............................................................................7, 8, 19

Facebook Terms of Use (Jan. 4, 2022),
https://www.facebook.com/legal/terms/update ............................................................................29-30

Insider Cookies Policy (Sept. 4, 2019)
https://www.insider-inc.com/cookie-policy ............................................................................7, 21

Merriam-Webster Dictionary
https://www.merriam-webster.com/dictionary/obtain ............................................................................25

Oxford Adv. Learner's Dictionary
https://www.oxfordlearnersdictionaries.com/us/definition/english/audiovisual ....................13
https://www.oxfordlearnersdictionaries.com/us/definition/english/material_1 ....................13

United States District Court for the Southern District of New York
https://www.nysd.uscourts.gov/jurors/resources-for-jury ............................................................................15

Webster's Ninth New Collegiate Dictionary (1984) ............................................................................19

## INTRODUCTION

The theory underlying this proposed class action lawsuit is that if a website (i) includes video content of any kind and (ii) uses the Facebook Pixel (a "snippet of code") to track basic website metrics about the ways in which visitors interact with the website, then there is a violation of the federal Video Privacy Protection Act ("VPPA").  Insider operates a news website that contains video clips and uses the Facebook Pixel.  Therefore, Plaintiffs say they and a national class of Insider.com visitors are entitled to a $2,500 statutory damages award "per violation" of the VPPA for a period spanning nearly 10 years.

Plaintiffs' misplaced theory would mean countless websites violate the VPPA.  But the VPPA is not a tool for taking down the internet.  It is a focused statute with a specific reach.  By its terms, the VPPA applies only to "video tape service providers"—entities "engaged in the business" of "rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).  The definition of a "video tape service provider" includes video rental services, like Blockbuster and its modern day equivalents, because the VPPA was enacted following publication of a news article disclosing (at the time, Supreme Court nominee) Judge Robert Bork's video rental history from his neighborhood video store.

Insider, on the other hand, provides news.  It does so primarily in written form, though also on occasion through audio or video clips.  It is not tantamount to Blockbuster, nor even Netflix or Hulu.  Insider is a news organization, not a video tape service provider.  And, even if it were (though it most certainly is not), Plaintiffs do not sufficiently allege that *Insider* disclosed information personally identifying them as having requested or obtained specific video materials, as is required to state a VPPA claim, let alone that it did so knowingly.

Indeed, Plaintiffs' Consolidated Complaint (ECF 27, hereafter "Compl.") does not allege much at all.  The Complaint does not identify any video on Insider's website that the Plaintiffs

viewed, much less explain how it is the Plaintiffs came to believe that Insider's website transmitted video viewing information about that video to Facebook. There is no "illustrative" example of video on Insider's website or a single fact showing how Insider's website incorporates Facebook's Pixel or discloses users' video viewing behaviors.

There is likewise no detail about the nature and scope of the Plaintiffs' "consumer" relationship with Insider, which the VPPA requires to bring claimants within the scope of the Act. Although the Complaint is quick to mention how long each of the Plaintiffs has had a *Facebook* account, there are no dates establishing the start of the Plaintiffs' "subscriptions" to *Insider*—the actual defendant here. There is no information about the type of Plaintiff Spritzer's alleged digital subscription to Insider, or when Plaintiff Johnson (who does not allege any subscription to Insider's services) signed up to receive a periodic newsletter.

If anything, the Complaint studiously avoids citation to any document that could arguably substantiate their allegations in a transparent attempt to avoid incorporation into the Complaint by reference of these materials, which Plaintiffs have necessarily relied upon, but which are in fact detrimental to their claims.[1] Instead, the Complaint refers cryptically to language and concepts taken directly from Insider's and Facebook's disclosures about their respective operations, and about Facebook's Pixel, but without explanation or citation. It then simply concludes (without pleading any facts showing) that the Facebook Pixel operates as Plaintiffs allege, and that Insider's website uses the Facebook Pixel as claimed.

---

[1] For a clearer description of how these technologies operate, the Court need look only to the original complaint in this matter, ECF 1, which has been replaced with a now vague and misleading set of legal conclusions that obfuscates the problems Plaintiffs must overcome on a motion to dismiss.

The Court should not be fooled.  Plaintiffs cannot avoid dismissal by creatively pleading around materials that refute their claims.[2]  Moreover, the Federal Rules of Civil Procedure require the Plaintiffs to do more than copy and paste allegations from other complaints.  To impose the substantial cost of discovery on a defendant, a plaintiff must plead "factual content that allows the court to draw the reasonable inference" that *this* defendant—Insider—is liable for the misconduct alleged.  These Plaintiffs have not done so.

*First,* as noted above, the VPPA applies only to "video tape service providers"—entities "engaged in the business" of "rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).  The short news clips Insider has on its website are not similar to prerecorded video cassette tapes and Insider, a news organization, is not engaged in the business of delivering such materials.

*Second*, the Plaintiffs' allegation of purportedly unlawful disclosures in the Complaint depends entirely on Insider's alleged disclosure of Plaintiffs' Facebook Profile IDs ("FIDs") to Facebook.  Put differently, apart from their FIDs, Plaintiffs do not allege that any other identifying data is conveyed to Facebook.  *See* Compl. ¶ 6.  But, as alleged in the Complaint, there is no "disclosure" of the Plaintiffs' FIDs.  An FID is a numerical code generated by Facebook and assigned to Plaintiffs by Facebook.  *Id*. ¶ 65 n.5.  The Complaint obfuscates the fact that the only means by which the Plaintiffs' FIDs are transmissible to Facebook is through

---

[2] Rather, even when a document is not incorporated by reference, "the court may nevertheless consider it where . . . the document integral to the complaint."  *Martin* v. *Meredith Corp.*, No. 22-cv-04776-DLC, 2023 WL 2118074, at *3 (S.D.N.Y. Feb. 17, 2023) (quoting *Nicosia* v. *Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016)).  As set forth below, Facebook's Cookie and Data Policies and Insider's Cookie Policy are all integral to the Complaint (not to mention, publicly available documents) that should be incorporated here.  *See id*. ("When deciding a motion to dismiss, a court may consider 'any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in it by reference.'").

cookies that Facebook places on the users' browser (specifically, the "c_user" cookie, *see* Compl. ¶ 65). The Plaintiffs further avoid mention of the fact that the Plaintiffs *consented* to the creation, placement, and transmission of these Facebook cookies when they signed up for Facebook accounts. It is nonsensical under such circumstances to discuss Facebook's receipt of its own FID—as a "disclosure" of personal information by Insider; to the contrary, it is information created and owned by Facebook that Facebook is entitled to have by its own user terms. Indeed, the Complaint does not even allege Insider knows or has access to users' FIDs (because it does not). Consequently, the VPPA is not triggered even if the Plaintiffs' conclusory allegations are assumed to be true.

*Third*, Plaintiffs are not within the class of persons protected by the VPPA because they are not subscribers to any *video content* published by Insider. To be sure, each Plaintiff alleges that they watched unspecified videos on Insider.com—but they do not allege that they purchased, rented, or subscribed to any such content and therefore they do not meet the basic definition of a "consumer" under the Act. Indeed, one of the Plaintiffs (Johnson) does not allege a subscription to Insider at all, but rather claims only that she signed up to receive a newsletter.

*Fourth*, the Plaintiffs do not allege any facts supporting their allegation that Insider made a knowing transmission of their personal video viewing records to Facebook. Instead, they just sprinkle the word "knowing" across the pleadings, which does nothing more than echo the statute's requirements.

The Plaintiffs' state-law claim for unjust enrichment fares no better. Plaintiffs cannot bring a standalone claim for unjust enrichment, so that claim fails together with the VPPA claim for the reasons above. And, even if that were not the case, the Complaint pleads no actual facts establishing that Insider benefitted from its alleged disclosure of video viewing information.

In sum, the Complaint should be dismissed with prejudice and Plaintiffs' efforts to join the VPPA fad—which posits a wholly unprecedented theory of nine figure liability—rejected.

## BACKGROUND

### A.     Insider's Services and Website.

Insider is a media organization that provides national and international news, entertainment, and social commentary.  Compl. ¶ 53.  Some pages of Insider's website contain short video clips some of which are embedded videos posted originally to social media sites or other publicly available websites, and some of which Insider creates in conjunction with traditional news text.  *See id.*  Although the Complaint alleges that the content on Insider's website is "available to its digital subscribers," *id.*, it does *not* allege the content is available *only* to digital subscribers—because the majority is not.  The Complaint also does not identify any videos actually available on Insider's website, let alone videos that the Plaintiffs viewed.

The Complaint alleges that Insider's website incorporates the Facebook Pixel.  *Id.* ¶¶ 4-5.  And, once installed, a website with the Pixel may track information about how its users interact with the site.  *See* Compl. ¶¶ 5, 64.  Plaintiffs allege (without citation or any factual support) that Insider configured its Facebook Pixel to track "the titles" of video clips that the user "requested," and that Insider sends this data to Facebook.  *Id.* ¶¶ 6, 65.

The Complaint also discusses FIDs.  Plaintiffs allege that any person can use an FID to "identify a particular individual" because an FID is linked to an individual's Facebook profile.  *Id.* ¶¶ 7, 65 n.5, 67.  While Plaintiffs appear to presume that Insider knows its website visitors' FIDs, *see*, *e.g.*, *id.* ¶¶ 6, 8, the Complaint pleads no facts alleging how Insider accesses or comes into possession of that data (because it does not).  The Complaint does, however, implicitly acknowledge that FIDs are transmitted by users' browsers only under certain conditions—

specifically, when visitors use the same device and browser to log into Facebook and to visit Insider.com, as Plaintiffs allege they did here.  Compl. ¶¶ 34, 44.

### B.    Facebook's Data Collection Practices and Disclosures.

The Complaint is equally devoid of detail relating to the operation of the Facebook Pixel, which Plaintiffs describe as "a snippet of programming code" that "tracks web visitors as they navigate through a website, including searches, button-clicks, and which links have been clicked on or viewed." *Id.* ¶ 5.  Insider (Plaintiffs say) uses "first-party and third-party cookies, software development kits ('SDK'), and Facebook's Business Tools" to implement and control how the Facebook Pixel operates on its site—that is, to set what information is conveyed through the Facebook Pixel from Insider's website back to Facebook as it is browsed by the user.  *Id.* ¶¶ 4 n.3, 5, 55, 57.  As noted above, Plaintiffs' only theory of liability here is that Insider "shares with Meta . . . it's subscribers' Facebook ID ('FID') and the titles of the prerecorded video content that the user requested."  *Id.* ¶ 6.

How Insider's website purportedly does so is largely left to the court's imagination.  The Complaint states only: "When an Insider digital subscriber enters the [Insider] website and views video media, that information is automatically sent to Meta via the Meta Pixel [that] Insider incorporated into its [Insider's] web code.  The information that is transmitted [to Facebook] identifies the visitor by their FID ('FID' or 'c_user') and is sent with the name of the video content they viewed."  *Id.* ¶ 65.

Nowhere in the Complaint is the concept of "cookies" or a "c_user" cookie further explained, nor is it alleged how any of these technologies are used by Insider's website to violate the VPPA in the manner alleged.  *Cf.* ECF 1 ¶ 26 (original complaint of Plaintiff Johnson alleging that "When a visitor watches a video on Businessinsider.com while logged into

Facebook, Defendant compels a visitor's browser to transmit the c_user cookie to Facebook. The c_user cookie contains that visitor's unencrypted Facebook ID.").

Facebook, however, explains that "[c]ookies are small pieces of text used to store information on web browsers," and that Facebook creates and uses cookies "to store and receive identifiers and other information on computers, phones and other devices."  Facebook Cookie Policy (Oct. 5, 2022), *available at* https://m.facebook.com/policy/cookies/printable.  Facebook further makes clear that the c_user cookie cited obliquely in the Complaint is used for "authentication reasons" including to keep Facebook users logged in as Facebook users navigate to and away from Facebook while surfing the web.  *Id.*

But, whatever the reason for a cookie's creation and use, "[t]he only servers that can access a particular cookie are those associated with the domain that wrote [it]."  *In re Hulu Priv. Litig.*, No. C 11–03764 LB, 2014 WL 1724344, at *4 (N.D. Cal. Apr. 28, 2014).  That means, for example, that "Hulu can read only hulu.com cookies, and it cannot read . . . facebook.com cookies."  *Id.*; *accord e.g., In re DoubleClick Inc. Priv. Litig.*, 154 F. Supp. 2d 497, 513 (S.D.N.Y. 2001) ("in every practical sense" a cookie is "both 'of' and 'intended for'" the company that created it).  Thus, Facebook is the only entity that has access to Facebook's cookies—including its "c_user" cookie purportedly containing the Plaintiffs' FIDs.  *See also* Insider Cookies Policy § 6.1 ("not[ing] that third parties (including, for example, advertising networks and providers of external services like web traffic analysis services) use cookies, over which we [Insider] have no control"); *id.* § 2.1 ("Cookies may store your preferences and other information but cannot read data off your hard disk or read cookie files created by other sites.").[3]

---

[3] https://www.insider-inc.com/cookie-policy (Sept. 4, 2019).  Facebook users moreover consent to such tracking by signing up for Facebook accounts, and permitting Facebook cookies on their

In implicit recognition that its allegations have zero support, the Complaint does not allege how Insider is able to access the Plaintiffs' FIDs (or, more accurately, Facebook's cookies), or even that Insider is able to do so; explain how Insider is allegedly able to link an FID "in the same transmission" as video information to Facebook; how Insider came to know about any such linkage; or how Insider "retains" an FID it does not have to Plaintiffs' detriment, *see id*. ¶ 76 (harms alleged "are aggravated" by Insider's "retention" of visitors' personal information).

###   C.   The Named Plaintiffs.

The two plaintiffs here—Jamie Spritzer and Sanchez Johnson—bring substantially similar allegations that differ in only one meaningful respect: Plaintiff Spritzer alleges that she "has an Insider digital subscription," Compl. ¶ 31, whereas Plaintiff Johnson claims she only "registered for Insider's newsletter," *id.* ¶ 41.  The Complaint does not allege that the newsletter contains video clips or relates in any way to video clips she supposed viewed on Insider's website.[4]  Each Plaintiff further alleges that she spends time on Facebook daily.  *Id.* ¶¶ 33, 43. And that each requested and watched "videos on Insider using the same device and browser that she use[d] to login to Facebook," and "while . . . logged in to Facebook."  *Id.* ¶¶ 34, 44.  Each Plaintiff then alleges that Insider disclosed her FID and the titles of videos she viewed to Facebook without obtaining her consent in the format specified in the Act.  *Id.* ¶¶ 35, 45.

---

devices and web browsers.  *See, e.g.*, Facebook Cookie Policy (Oct. 5, 2022) (providing conspicuous links for users to access their ad preferences and control how Facebook uses "information that [it] collect[s] to show you ads," to adjust ad preferences, to review "a summary of activity that businesses and organizations share with [Facebook]" about users and to manage "off-Facebook activity"; your interactions with them; and to opt-out from advertising technologies, including cookies, by modifying browser settings).

[4] Plaintiffs Darmel Roby, Jennifer Juenke, and Timothy Stokes voluntarily dismissed their claims pursuant to Rule 41.  ECF 39 (motion), 40 (order).

For their VPPA claim, the Plaintiffs seek relief for themselves and a national class of visitors to Insider's website. *Id.* ¶ 101. They seek $2,500 in statutory damages "per violation" for a period stretching back to 2013, notwithstanding that the statute of limitations under the VPPA is only two years, 18 U.S.C § 2710(c)(3), and that the Complaint does not allege when during this 10-year period Plaintiffs began using Insider (nor why Insider's Cookie Policy effective September 4, 2019 was insufficient to put them on notice of their claims). *See* Compl. ¶¶ 78, 101 (class allegations) & 31-32 (Plaintiff Spritzer allegations), 41-42 (Plaintiff Johnson).

## ARGUMENT

The Complaint fails to state a claim for relief both because it lacks any facts that make Insider's alleged conduct plausible and because, even assuming the Complaint's unsupported conclusions were alone sufficient (they are not), the allegations do not state a claim for relief.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009); *Green* v. *Dep't of Educ. of N.Y.*, 16 F.4th 1070, 1076-77 (2d Cir. 2021) (per curiam). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Charles* v. *Orange Cnty.*, 925 F.3d 73, 81 (2d Cir. 2019); *see also Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007) ("[f]actual allegations must be enough to raise a right to relief above the speculative level").

Although on a motion to dismiss a court must generally "accept all factual allegations as true" and "draw all reasonable inferences in favor of the plaintiffs," *Melendez* v. *City of N.Y.*, 16 F.4th 992, 1010 (2d Cir. 2021), "that principle does not apply to general allegations that are contradicted by more specific allegations in the Complaint," *DPWN Holdings (USA), Inc.* v. *United Air Lines, Inc.*, 747 F.3d 145, 151-52 (2d Cir. 2014), nor to "legal conclusions," *Iqbal*,

556 U.S. at 678.  Similarly, a court "must dismiss a claim if a plaintiff pleads himself out of court by alleging facts which show that he has no claim."  *Soto* v. *Disney Severance Pay Plan*, 26 F.4th 114, 120 (2d Cir. 2022).

If the "well-pleaded facts" (i.e., those that are not contradicted or conclusory) "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).  "Determining whether a complaint states a plausible claim for relief" is "a context-specific task" that requires a court "to draw on its judicial experience and common sense." *Id.*

## I.     THE VPPA CLAIM FAILS BECAUSE INSIDER IS NOT A VIDEO TAPE SERVICES PROVIDER SUBJECT TO LIABILITY UNDER THE ACT.

Plaintiffs' Complaint fails first and foremost because the VPPA "does not apply to news organizations." *Stark* v. *Patreon, Inc.*, No. 3:22-cv- 03131-JCS, ECF 49-1, at 11 (N.D. Cal. Dec. 5, 2022) (United States's memorandum in support of VPPA's constitutionality under the First Amendment).  The VPPA is a video privacy law directed at "video tape service providers."  18 U.S.C. § 2710(b).  Video tape service providers are entities "engaged in the business" of renting, selling, or delivering "prerecorded video cassette tapes or similar audio visual materials." *Id.* § 2710(a)(4).  Thus, for the VPPA to apply, (i) the materials at issue must be prerecorded video cassette tapes or similar audio visual materials, and (ii) the entity allegedly liable must be engaged in the business of delivering such content. *Id.*

The Complaint does not allege either requirement.  Short news clips are neither pre-recorded video tapes nor audio visual materials "similar" to pre-recorded video tapes.  And Insider does not "engage in the business" of delivering such materials.  For each independent reason, Plaintiffs' VPPA claim should be dismissed.

### A.   The VPPA Applies Only to Providers Who Deliver Video Content "Similar" to Pre-Recorded Video Tapes, Which Insider Does Not.

The Complaint provides only a single paragraph in support of the allegation that Insider is a video tape service provider: Insider "is a multimedia organization that provides national and international news, entertainment, and social commentary," and it is (Plaintiffs say) "a video tape service provider because it creates, hosts, and disseminates thousands of videos on www.insider.com, and a section of its website is dedicated to video content." Compl. ¶ 53.  The Complaint contains not one detail about the nature of the video content Insider provides— not their average length, whether they are more akin to a clip or feature film, or whether they were created by Insider or someone else.  This alone requires dismissal of the Complaint because the VPPA does not apply indiscriminately to "any" or "all" video content.  Rather, to plead disclosure of video materials within the scope of the VPPA, the Plaintiffs must allege facts plausibly showing that Insider rents, sells, or delivers "prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).  Insider quite obviously does not deliver "prerecorded video cassette tapes."  So, Plaintiffs must plausibly show that Insider's video content is "similar" to such tapes.  *See id.* They have not and cannot do so.

Neither the phrase "prerecorded video cassette tapes" nor the phrase "similar audio visual materials" is defined.  Thus, the court must give those terms their "ordinary meaning, considering the commonly understood meaning of the statute's words at the time Congress enacted the statute, and with a view to their place in the overall statutory scheme." *Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403, 418 (2d Cir. 2022).  This inquiry is a question of law that needs no further factual development and should be decided now.  *Dunlop Tire & Rubber Corp.* v. *Interstate Commerce Comm'n*, 724 F.2d 349, 350 (2d Cir. 1983) (per curiam) (statutory interpretation is a question of law); *see also United States* v. *DiCristina*, 726 F.3d 92, 105 (2d

Cir. 2013) (rejecting defendant's argument that whether poker constitutes gambling under the Illegal Gambling Business Act is a "mixed question of law and fact" to be submitted to the jury and holding instead it is a "purely" a question of law).

Here, the VPPA uses the phrase "pre-recorded video cassette tapes" as an apparent synonym for "video tape" or VHS.  *See* 18 U.S.C. § 2710.  And the legislative history is clear that "video tape" at the time of the statute's enactment was intended to mean feature length videos, such as movies and television shows.  As one court recently summarized:

> Although [the VPPA's] sponsors were troubled in part by the increasing prevalence of commercial databases tracking and sharing consumers' personal information, '[t]he impetus for this legislation occurred when a weekly newspaper in Washington published a profile of Judge Robert H. Bork based on the titles of 146 films his family had rented from a video store,' and the legislative history also notes an incident where an attorney 'made an informal request' for an individual's video rental history in [a custody battle].

*Stark*, No. 22-cv-03131-JCS, 2023 WL 2090979, at *11 (N.D. Cal. Feb. 17, 2023) (quoting S. Rep. 100-599, at 5-6 (1988)).  Thus, as the bill's sponsors concluded, "[t]he bill prohibits *video stores* from disclosing 'personally identifiable information'—information that links the customer or patron to particular materials or services."  S. Rep. 100-599, at 7 (emphasis added).

To be sure, the VPPA's sponsors recognized that "[s]ome video tape service providers sell limited types of videos.  For example, a golf shop may rent or sell golf videos, or a continuity club might rent or sell only Star Trek videos."  *Id.* at 13.  But even in these examples the "videos" available for rent sale were not short video clips—Star Trek was a television show and movie franchise and there is no reason to believe "golf videos" available in golf shops in 1988 were anything less than feature length tapes.  And, in 1988 when the VPPA was enacted, it was not possible (and not contemplated), that a local news story pre-recorded in the morning and shown on the evening news was a "video tape" sold by a "video store" subject to the VPPA.

Nor does the phrase "similar audio visual materials," which is likewise undefined, expand the universe of materials covered by the Act.  The ordinary meanings of the terms "audio visual" and "materials" are straightforward:  The term "audio visual" means involving sight and sound. *See, e.g.*, Oxford Adv. Learner's Dictionary. [5]  And "material" means a substance from which things can be made.[6]  *Id.*  "This does not mean, however, that *any* [media involving sight and sound] is entitled to protection under [the VPPA].  Instead, pursuant to the canon of construction *noscitur a sociis*, the word[] . . . 'similar' restrict[s] the scope of protected [materials] to only those that conceivably resemble the other listed terms in the statute."  *Springfield Hosp.*, 28 F.4th at 419 (emphasis added) (holding Section 525(a) of the Bankruptcy Act, which prohibits any governmental entity from denying any "license, permit, charter, franchise, or other similar grant to" a bankrupt debtor, does not prohibit the denial of "any" grant; rather, it prohibits the denial only of those grants that are similar to a "license, permit, charter, [or] franchise"); *accord United States* v. *Stanko*, 491 F.3d 408, 414 (8th Cir. 2007) ("Congress use[s] the comparative term 'similar' to . . . indicate[] an intent to limit the . . . clause's reach to offenses which are 'comparable' or 'nearly corresponding' to the enumerated offenses.").

The term "similar" is *restrictive* in nature—that is, it is a phrase used to *narrow* the scope of a statute's reach to particular items.  In a different case construing the provision "[b]ooks, libraries, usual and reasonable furniture, and similar household effects," the Second Circuit unequivocally concluded that "[t]he insertion of the word 'similar' indicates that Congress intended to do away with the exemption of household effects *generally*, and to restrict it to such [sic] as should be like books, libraries, or household furniture."  *United States* v. *W.R. Grace &*

---

[5] https://www.oxfordlearnersdictionaries.com/us/definition/english/audiovisual.

[6] https://www.oxfordlearnersdictionaries.com/us/definition/english/material_1?q=material.

*Co.*, 166 F. 748, 749 (2d Cir. 1909) (emphasis added).  The same reasoning applies here.  It is untenable that the phrase "similar audio visual materials" expands the VPPA to *all* video content.

Instead, in the context of the VPPA, providers of "similar audio visual materials" refers to businesses that use new technologies but for the purpose of delivering the same film television, or video materials like those that were found in "video stores."  The courts that have meaningfully addressed this issue have concluded as much.  For example, the court in *In re Hulu Privacy Litigation* concluded that the "similar audio visual materials" prong may cover platforms like Hulu because it uses "new technologies for pre- recorded video content," No. C 11-03764-LB, 2012 WL 3282960, at *5 (N.D. Cal. Aug. 10, 2012); and the court in *In re Vizio, Inc., Consumer Privacy Litigation* concluded that the VPPA may cover Vizio because its Smart TV enabled access to movie and television streaming platforms like Netflix, Hulu, YouTube, and Amazon Instant Video—all of which deliver the same feature length pre-recorded video tape content sold in stores in 1988, 238 F. Supp. 3d 1204, 1222 (C.D. Cal. 2017).

The Senate Report that accompanied the legislation's enactment, which identifies laser discs, open-reel movies, and CDI technology as examples of "similar audio visual materials" covered by the Act confirms this plain reading of the text.  S. Rep. No. 100-599, at 12.  These illustrations underscore that it is irrelevant under the VPPA on what medium a video is stored, but keeps limited the VPPA's privacy protections, which extend to "only those transactions involving the purchase of video tapes [or services] and not other products."  *Id.*  To understand the scope of the Act any more broadly would improperly render the statute's limitation of coverage to "similar audio video materials" superfluous.  *Cf. CFTC* v. *Byrnes*, No. 13-cv-1174-VSB, 2019 WL 4515209, at *6 n.16 (S.D.N.Y. Sept. 19, 2019) (a "most basic" rule of statutory

interpretation is "that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative") (quoting *Corley* v. *United States*, 556 U.S. 303, 314 (2009)).

It would also result in obviously absurd results.  If the definition of a video tape service provider is unmoored from the concept of a traditional video seller, there is no viable limiting principle to restrain the scope of the Act.  A recording artist that includes animations or video on a screen behind the stage at a concert would be a video tape service provider because his or her concert has a video element. The Museum of Modern Art would likewise be a video tape service provider because it includes video exhibits. This court would be a video tape service provider because its website includes cut scenes of introductory videos for jurors.[7]  These are not hypothetical, *Chicken Little* scenarios.  Lawsuits alleging putative class actions under the VPPA—brought by the very same counsel as this matter—have targeted (among many others) Chik-Fil-A (a restaurant chain), GameStop (a seller of video games), Military.com (a military family support website), and various news organizations and media companies like Insider—all allegedly video tape service providers covered under the Act.[8]  "[S]tatutes must be interpreted in a way that avoids absurd results."  *Kane ex rel. United States* v. *Healthfirst, Inc*., 120 F. Supp. 3d 370, 386 (S.D.N.Y. 2015).  This Court, like the Ninth Circuit, should "not [be] persuaded that the 1988 Congress intended for the VPPA to cover circumstances so different from the ones that motivated its passage."  *Eichenberger* v. *ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017) (holding a Roku device serial number does not constitute PII under the VPPA).

---

[7] https://www.nysd.uscourts.gov/jurors/resources-for-jury.

[8] *E.g., Carroll* v. *Chik-Fil-A, Inc.*, No. 3:23-cv-314-LJC, ECF 1 (N.D. Cal. Jan. 22, 2023); *Aldana* v. *GameStop, Inc.*, No. 1:22-cv-7063-LTS, ECF 1 (S.D.N.Y. Aug. 18, 2022); *Ramirez* v. *Military Advantage, Inc.*, No. 1:22-cv-10892-WGY, ECF 1 at 8 (D. Mass. June 8, 2022); *Martin* v. *Meredith Corp.*, No. 1:22-cv-4776-DLC, ECF 1 (S.D.N.Y. June 7, 2022).

The VPPA applies to video content similar to materials available at traditional video tape stores, such as movies and TV shows.  Because Plaintiffs have not and cannot allege that Insider provides such materials, the Complaint fails to allege that Insider is a "video tape services provider" and should be dismissed.

### B.  Insider Is Likewise Not "Engaged In the Business" of Delivering Pre-Recorded Video Tapes or Similar Materials.

Insider is also not a video tape service provider because it is not "engaged in the business" of video tape sales, rental or delivery. To be a video tape service provider, "the defendant's product must not only be substantially involved in the conveyance of video content to consumers but also significantly tailored to serve that purpose." *In re Vizio,* 238 F. Supp. 3d at 1221.  It must be a "*focus* of the defendant's work." *Id.* (emphasis added).  Allegations that a business is "peripherally or passively involved in video content delivery do not [bring that business] within the statutory definition of a video tape service provider." *Id.* at 1221–22.

Plaintiffs have not alleged any qualitative or quantitative facts establishing that a "substantial portion" of Insider's content is devoted to "prerecorded video content" "similar" to video cassettes; nor facts establishing that prerecorded video content is a "focus" of the services Insider provides.  The Complaint further makes no effort to show that any video content incidentally present on Insider's website transforms the company into the equivalent of an online video rental store, or suggest that users come to Insider.com to rent, buy, or subscribe to videos.  Simply put, that some Insider webpages includes video clips does not transform Insider into a business "significantly tailored" to providing traditional VHS content.  *See McMillian* v. *Amazon.com, Inc.*, 983 F.3d 194, 199 (5th Cir. 2020), *certified question answered*, 625 S.W.3d 101 (Tex. 2021) (construing "engaged in the business" and observing, "When the client walks out of the salon, she has shorter hair, but she also has a head full of hair product. . . . Still, a

hairdresser is in the business of selling haircuts, not selling handfuls of mousse. One does not go to the hair salon to acquire a dollop of moisturizing serum and a few spritzes of hairspray.").

Indeed, as noted above, accepting Plaintiffs' theory would mean that every organization with a website that also happens to include a video element would be "engaged in the business" of providing a video services and exposed to VPPA liability.  Such impossibly broad scope is not supported by the VPPA's narrow reach.  *See In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d. 262, 288 (3d Cir. 2016) (the VPPA "serves different purposes and protects different constituencies, than other, broader privacy laws").  Even the U.S. Attorney General's Office in defending the VPPA against First Amendment challenge has acknowledged that a news organization is not a video tape service provider subject to liability under the VPPA.  *Stark,* No. 3:22-cv- 03131-JCS, ECF 49-1, at 11 (the VPPA "does not apply to news organizations . . . or other entities whose mission is to publicize information of public import"); *id.* at 18 ("[T]he VPPA does not impose liability on any entity other than a 'video tape service provider' for revealing [video viewing] information—including any news organization").[9]

Accordingly, absent allegations plausibly showing that Insider provides materials "similar to" pre-recorded video tapes or focuses its business on providing such content to consumers, Plaintiffs cannot maintain a VPPA claim.

---

[9] In the alternative, the court should dismiss the Complaint because the VPPA is an unconstitutional restriction on speech under the First Amendment.  The VPPA imposes a content-based restriction and (i) does not survive the reduced scrutiny applicable to commercial speech because its means (restricting only video content) do not serve its ends (protecting privacy rights) when the same content could be reviewed in audio or written form and disclosure would be permitted; and (ii) when applied to non-commercial speech, the VPPA does not satisy heightened scrutiny.  *See Stark*, 2023 WL 2090979, at *13 (noting that this defendant did not argue the VPPA fails the reduced scrutiny applicable to commercial speech and further factual development required to address overbreadth of VPPA as to non-commercial speakers).

## II.     THE VPPA CLAIM FURTHER FAILS BECAUSE INSIDER HAS NOT DISCLOSED PERSONALLY IDENTIFABLE INFORMATION.

The VPPA claim should be dismissed for the independent reasons that there has been no disclosure of personally identifiable information ("PII") under the circumstances alleged.  To plead a disclosure of PII, Plaintiffs must allege that Insider disclosed information "identif[ying]" both the "specific video materials or services" requested or obtained, and the person who "requested or obtained" that material. 18 U.S.C. § 2710(a)(3).  Thus, a viable VPPA claim requires "three distinct elements": "the consumer's identity; the video material's identity; and the connection between them."  *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015) (emphasizing that "[t]he point of the VPPA . . . is not so much to ban the disclosure of user or video data; it is to ban the disclosure of information connecting a certain user to certain videos"). Here, the Complaint fails to allege any of the three.

*First*, *Facebook* assigns its users' Facebook ID and creates the "c_user" cookie that sits on a user's browser and contains that information.  Insider does not know or ever see users' Facebook IDs.  Consequently, however implemented, there is no "disclosure" of information to Facebook even assuming that an FID is conveyed to Facebook through a Facebook cookie when a user is visiting Insider's website.

*Second*, transmission of a "cookie" that is inaccessible to Insider and unreadable to any party other than Facebook is not "the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior," *Wilson* v. *Triller, Inc.*, 598 F. Supp. 3d 82, 91 (S.D.N.Y. 2022), and it is therefore not "personally identifying information" within the meaning of the VPPA.

*Third,* the Complaint does not plead any facts showing that Insider disclosed "specific video materials or services" to Facebook.  Although the Complaint repeatedly claims Insider

disclosed video "titles," it does so without including any actual facts showing what "title" information is allegedly shared, for example whether it is the URL of the webpage being viewed (which one court has held is *not* a disclosure of specific video material) or some other data.

### A.   Transmission of A Facebook ID *to Facebook* Is Not A "Disclosure."

The VPPA does not define the term "disclose."  But the ordinary meaning of that term is "[t]he act or process of making known something that was previously unknown; a revelation of facts."  Black's Law Dictionary 497 (Garner 8th ed. 2004); *see also* Webster's Ninth New Collegiate Dictionary 360 (1984) ("[T]o expose to view . . . to make known or public.").  These definitions make clear what is also common sense—it is not possible to "disclose" something to someone who already knows it.  *See, e.g.*, *Quinn* v. *Stone*, 978 F.2d 126, 134 (3d Cir. 1992) (there has been no "disclosure" under the Privacy Act "where the agency makes available information which is already known by the recipient");[10] *cf. e.g.*, *United States* v. *Rigas*, 2008 WL 144824, at *2 (S.D.N.Y. Jan. 15, 2008) (*Brady* does "not obligate[] [the government] to disclose information that defendants[] already know"), *aff'd*, 583 F.3d 108 (2d Cir. 2009).

Here, the only information that Insider allegedly disclosed to Facebook to identify the Plaintiffs is their respective Facebook IDs.  Compl. ¶¶ 6, 35, 45.  But, as the Plaintiffs themselves acknowledge, *Facebook* assigned the Plaintiffs' their FIDs.  Compl. ¶ 65 n.5.  And Facebook created the "c_user" cookie that stored that FID on the Plaintiffs' browsers.  Facebook Cookie Policy (Oct. 5, 2022) (Facebook uses the "c_user" cookie, among others, to keep Facebook users logged in as they navigate between Facebook pages and to "remember" a user's browser so that the user need not keep logging into Facebook as they navigate the web).

---

[10] *Accord Kline* v. *Department of H.H.S.*, 927 F.2d 522, 524 (10th Cir. 1991); *Reyes* v. *Supervisor of D.E.A.*, 834 F.2d 1093, 1096 n.1 (1st Cir. 1987); *Pellerin* v. *Veterans Admin.*, 790 F.2d 1553, 1556 (11th Cir.1986); *F.D.I.C.* v. *Dye*, 642 F.2d 833, 836 (5th Cir. Unit B 1981).

Plaintiffs plead no facts suggesting Insider ever knew or even had access to users' FIDs (because it does not). Under such circumstances, there is no "disclosure" of either the Plaintiffs'—nor any other Insider website user's—FID by Insider, and consequently the VPPA is not triggered by Insider's use of the Pixel.[11]

### B. Facebook Cookies are not PII.

Even if there were a disclosure by Insider (which there is not), Facebook cookies (including the c_user cookie) are not PII because cookies are not "the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior." *Wilson*, 598 F. Supp. 3d at 91. To make out a VPPA claim, Plaintiffs must allege plausibly that the information disclosed by Insider "identif[ies] a particular person—not just an anonymous individual—and connect[s] this particular person with his or her viewing history." *Robinson* v. *Disney Online*, 152 F. Supp. 3d 176, 179 (S.D.N.Y. 2015). "The point of the VPPA, after all, is not so much to ban the disclosure of user or video data" but "to ban the disclosure of information connecting a certain user to certain videos." *In re Hulu*, 86 F. Supp. 3d at 1095.

The majority rule defines PII as "the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior." *Wilson*, 598 F. Supp. 3d at 91. In other words, PII "must, without more, itself link an actual person to actual video materials." *Robinson*, 152 F. Supp. 3d at 180; *see also Eichenberger*, 876 F.3d at 985; *In*

---

[11] Notably, even if there was somehow a "disclosure" of the Plaintiffs' identity through the transmission of Facebook's c_user cookies back to Facebook, it was a disclosure to which the Plaintiffs consented through the acceptance of Facebook's Cookie Policy, which describes the "what," "when," and "how" of its cookie usage clearly and concisely. *See Airbnb, Inc.* v. *City of New York*, 373 F. Supp. 3d 467, 497 (S.D.N.Y. 2019) (holding that the "clear language" of AirBnB's and HomeAway's Privacy policies and Terms of Service established effective user consent to the possibility that information would be disclosed to governmental entities).

*re Nickelodeon*, 827 F.3d. at 290.  The alternate reading of the VPPA—that PII is recipient-dependent—has been expressly rejected by the two courts in this District to have addressed the issue:  in *Robinson*, the court reasoned that it would render the definition of PII meaningless if the term turned on "what third parties might conceivably be able to do" with a disclosure. 152 F. Supp. 3d at 181. Likewise in *Wilson*, the court opined that, based on the statutory text, "[i]t would make little sense for the scope of PII to be recipient-dependent," 598 F. Supp. 3d at 91-92.

Here, Plaintiffs here try to obscure the applicable cookie technology by portraying the relevant PII at issue as the Plaintiffs' Facebook IDs.  *See, e.g.*, Compl. ¶ 4 n.3 & 6 (Insider discloses the Plaintiffs' FIDs, and also uses cookies).  Critically, however, a Facebook ID is decidedly *not* what Insider's website allegedly "compelled" a user's web browsers to disclose.  Rather, it is Facebook's *cookie*, not the Facebook ID, that was purportedly transmitted to Facebook.  *See* ECF 1 ¶ 26 (alleging, "When a visitor watches a video on Businessinsider.com while logged into Facebook, Defendant compels a visitor's browser to transmit the c_user cookie to Facebook.  The c_user cookie contains that visitor's unencrypted Facebook ID.").

The sleight of hand is necessary because Facebook's *cookies* are decidedly *not* information an ordinary person could use to identify an individual:  No party other than Facebook is able to read those cookies, much less extract the information they contain to identify a particular person.  *In re Hulu*, 2014 WL 1724344, at *4 ("The only servers that can access a particular cookie are those associated with the domain that wrote the cookie. That means that [a defendant] can read only [its own] cookies, and it cannot read . . . facebook.com cookies.").[12] Indeed, a court in this District denied a plaintiff's preliminary injunction in part on this basis,

---

[12] *See also* Insider Cookies Policy § 6.1 ("third parties . . . use cookies, over which we [Insider] have no control"); *id.* § 2.1 (Cookies "cannot . . .  read cookie files created by other sites.").

recognizing that a Facebook cookie was not clearly PII under the VPPA. *Bernardino* v. *Barnes & Noble Booksellers, Inc.*, No. 17-cv-04570-LAK-KHP, 2017 WL 3727230, at *9 (S.D.N.Y. Aug. 11, 2017) ("[T]here is case law to support Barnes & Noble's position that the alleged disclosure [of Facebook's 'fr' cookie] may not constitute PII."), *R&R adopted*, No. 17-cv-4570-LAK, 2017 WL 3726050 (S.D.N.Y. Aug. 28, 2017).[13]

## C.   Insider Has Not Disclosed "Specific Video Materials or Services."

The Complaint also fails to allege that Insider discloses information sufficient to identify the "specific video materials or services" "requested or obtained" from a video tape service provider as required for liability under the Act.  18 U.S.C. § 2710(a)(3).  The Complaint states that "Insider is a video tape service provider because it creates, hosts, and disseminates thousands of videos on [insider.com], and a section of its website is dedicated to video content." Presumably (since there is no allegation either disputing or confirming as much) each of those videos is accessible only through particular webpages (i.e., URLs), and each video may or may not be accompanied by text.  The Complaint repeatedly alleges with no factual support that Insider discloses the "titles" of videos the Plaintiffs have watched on Insider's website.  *See* Compl. ¶¶ 3, 6, 35, 45, 99.

---

[13] One court in this district has held to the contrary reasoning that, assuming that the defendant website had in fact installed the Pixel as alleged in the complaint, the defendant had "opened a digital door and invited Facebook to enter that door and extract information from within" by compelling the disclosure of Facebook's own cookies to Facebook.  *Czarnionka* v. *Epoch Times Ass'n*, No. 22 Civ. 6348-AKH, 2022 WL 17069810, at *3 (S.D.N.Y. Nov. 17, 2022).  We disagree.  But even assuming it is correct, there is no reason to believe that when the Pixel— which allegedly tracks all kinds of information—was installed by a defendant the defendant either (a) knew that transmission of an. FID was part of the Pixel's operation (because as set forth above third parties cannot access Facebook's cookies), nor (b) that whatever information the Pixel conveyed to Facebook specifically identified any person.  It is not enough to simply state Insider "knew."

But it is ambiguous to what the Plaintiffs refer when they say the "title" of a video. Insider does not provide videos in the traditional VHS sense; it provides articles with video clips. Not all video clips have a "title."  And by alleging disclosure of a video clip's title, the Complaint could be referring to the title of an Insider news *article*; or to an Insider *URL*;[14] or to something "specific" to the video clip ostensibly "requested" or "obtained" by the website visitor.  The Complaint does not specify which of these possibilities it is alleging, nor even one "title" of any particular video material that Insider allegedly disclosed.  This failure alone warrants dismissal of Plaintiffs' VPPA claim because it matters what exactly it is the Plaintiffs are alleging when they claim Insider disclosed particular video content.

A court in this District recently dismissed a complaint alleging that People.com violated the VPPA through its use of the Facebook Pixel because the only video information allegedly sent by the website to Facebook was a particular URL.  *Martin v. Meredith Corp.*, 2023 WL 2118074, at *3.  The court dismissed the complaint reasoning that "simply disclosing the name of a webpage and associated Facebook ID leaves off essential information for a VPPA claim, including at least: (1) whether the webpage contains a video; (2) if so, the name of the 'specific video materials' on the page; (3) whether there are multiple videos on the page and, if so, which 'specific video materials' were requested or obtained by the website visitor; and (4) whether the website visitor 'requested or obtained' any videos at all or instead merely read an article on the webpage." *Id.*  The Complaint here fails for the same reason.

Consider, for example, the Insider article entitled, "*TikTokers are anxiously filming themselves quitting their jobs in real-time and the internet is cheering them on*," which is

---

[14] The Complaint (at ¶ 68) acknowledges URLs just once, noting that "with only . . . the video content name and URL," any person could learn the specific video requested on insider.com.

accessible through the somewhat similar but differently named URL, https://www.insider.com/

tiktok-fintech-quitting-videos-positive-manager-boss-viral-viewers-jobs-2023-2.  By viewing

this story, Insider visitors can (but don't necessarily) watch one of two embedded TikTok videos,

one of which is depicted below (as shown on both the Insider website and on TikTok):



*Screenshot of Insider article*



*Screenshot of same video on Tik Tok*

In this example, it is entirely unclear what "title" would allegedly be disclosed to Facebook.  Many TikTok videos, such as this one, do not have titles.  No information in this example—not the title of the article, the URL on which it is hosted, nor anything else—identifies that a specific video clip was "requested" or "obtained" by the Insider visitor.

For that matter, it is not clear what Plaintiffs mean when they allege that a user has "requested" or "obtained" video clips on the Insider website.  To "obtain" something is "to gain or attain [it] *usually by planned action or effort*."  Merriam-Webster Dictionary (emphasis added), *available* at https://www.merriam-webster.com/dictionary/obtain.  The Plaintiffs have not alleged that a website visitor knows *ex ante*, before clicking on an article, that the article will contain a video (or videos), nor whether any of the clips in the article require affirmative user action (such as a button click).  They may instead begin to play automatically.  The VPPA is designed to protect viewing *choices*, not happenstance video review.  Because the Complaint fails to plead any facts about the specific video materials the Plaintiffs requested or obtained, let alone the "essential information" identified in *Meredith*, it must be dismissed.[15]

### III.     THE PLAINTIFFS ARE NOT "CONSUMERS" UNDER THE VPPA.

Even if Insider were a video tape service provider (it is not), and it had disclosed information capable of identifying the viewing materials requested by individual consumers (it has not), Plaintiffs do not allege facts that would qualify them as "consumers" under the VPPA.  Under the Act, a consumer is a "renter, purchaser, or subscriber of goods or services from a video tape service provider."  18 U.S.C. § 2710(a)(1); *see also In re Vizio, Inc.*, 238 F. Supp. 3d

---

[15] Because the only information identifying the person that requested or obtained the specific video materials the Complaint alleges Facebook receives is the FID that it already has, the Complaint also fails to plead the required  "connection" between the consumer's identity and the video material's identity.  *See In re Hulu*, 86 F. Supp. 3d at 1095.

at 1222 (VPPA's definition of "consumer" is "somewhat narrower" than the word's ordinary meaning).  Here, neither Plaintiff alleges that she has rented or purchased any videos from Insider and in fact Plaintiff Johnson does not allege she purchased or rented *anything* at all from Insider, only that she signed up for an Insider email newsletter.  These allegations do not plausibly allege that Plaintiffs are VPPA "consumers."

The term subscriber is not defined in the VPPA, but courts have construed it consistently.  All agree that a VPPA subscription does not require payments.  But for the VPPA to apply, courts still look for allegations showing a connection between a would-be subscriber and the defendant's provision of video content.  This is hardly surprising in light of the Act's passage following the leak of Supreme Court nominee Robert Bork's videotape rental history from a brick-and-mortar video store.  *See* S. Rep. 100-599 at 5.  But neither the text nor the intent of the VPPA covers a business's—even ones that *are* engaged in the videotape rental business— provision of materials or services unrelated to video delivery.  *See id.* at 11-12 ("[S]imply because a business is engaged in the sale or rental of video materials or services does not mean that all of its products or services are within the scope of the bill.").

The Act's circumscribed reach is reflected in opinions that have grappled with the issue. The Eleventh Circuit, for example, has twice considered whether a consumer's use of a free app made her a subscriber under the VPPA.  In each case, the court looked to whether the plaintiff's use of the app to watch videos involved "some type of commitment, relationship, or association (financial or otherwise) between a person and an entity."  *Ellis* v. *Cartoon Network, Inc.*, 803 F.3d 1251, 1256-1258 (11th Cir. 2015); *see also Perry* v. *Cable News Network, Inc.*, 854 F.3d 1336, 1341 (11th Cir. 2017).  In *Ellis*, the court specifically focused on the difference between having access to video content (like any other free user) and subscribing to it; the latter described

a "subscriber" relationship under the VPPA, but the former did not. 803 F.3d at 1257

("Importantly, [a non-subscriber] is free to delete the app without consequences whenever he

likes, and never access its content again."). And in *Perry*, the court agreed that the plaintiff's

ability to access exclusive video content on the CNN app because of his cable television

subscription "show[ed] a commitment to . . . his cable television provider"—i.e., the entity that

provided access to the subscribed-to video content—but not the app provider, with whom the

plaintiff was not required to "engage[] . . . to gain access to [video content]." 854 F.3d at 1342-3.

The First Circuit reached a different conclusion in *Yershov v. Gannett Satellite*

*Information Network, Inc.*, but still anchored its test to an identified connection between the

plaintiff and the defendant's delivery of video material.  820 F.3d 482, 489 (1st Cir. 2016).

There, the plaintiff alleged that he provided the defendant with personal information (his unique

Android ID number and GPS location) in exchange for streaming video content.  In the First

Circuit's view, that consideration—the exchange of information for video content—was enough

to establish a subscriber relationship under the VPPA. *Id.*  The opinion reiterated the point by

considering a "non-electronic version" of the same relationship: a hypothetical, free telephone

hotline to *request videos* on demand would, the court posited, also count as a VPPA

"subscription."  *Id.*  In both actual and hypothetical cases, then, the point was the link between

the plaintiff, on the one hand, and the defendant's delivery of *video content*, on the other.

In line with these tests, the decision of a court in this District in *Austin-Spearman v. AMC*

*Network Entertainment LLC*, 98 F. Supp.3d 662 (S.D.N.Y. 2015), demonstrates the limits of the

VPPA's reach.  In that case, the plaintiff alleged that she watched video clips from a TV show on

AMC's website but did not allege any other commitment to or relationship with the website's

provision of video content.  *Id.* at 664, 669.  The court held that this alleged "casual consumption

of web content, without any attempt to affiliate with or connect to the provider . . . [did] not suffice to render Austin–Spearman a 'subscriber' of AMC." *Id.* at 669.  Attempting to salvage her case, the plaintiff requested leave to amend based on a representation that she had also subscribed to an AMC newsletter about her TV show.  *Id.* at 671.  While the proposed amendment would undoubtedly have evidenced a relationship between the plaintiff and AMC, the court explained that was likely not enough to allege a subscriber relationship under the VPPA because the "newsletter" was "distinct and set apart from [AMC's] provision of videos."  *Id.*

Here, and unlike any other case where a subscriber relationship has been sufficiently alleged, Johnson alleges only that she "viewed prerecorded video content on [Insider's] website," and that she  received a periodic Insider newsletter.  Compl. ¶¶ 41-42.  She does not allege that the Insider newsletter itself contained videos, nor that there was any link between the newsletters she received and the video clips she watched.  Her barebones allegation puts her in a worse position than the plaintiffs in *Ellis*, *Perry*, and *Yershov*, all of whom at least downloaded the defendant's app on their phones and, because of that minimal "commitment," might have felt compelled to watch videos on it.[16]  But in this case, there is nothing to distinguish Johnson from any visitor to Insider's website that happened to watch video clips.  As in *Austin-Spearman*, allegations of a newsletter subscription are insufficient to make her a "consumer" under the Act.

So too with respect to Spritzer who has neither alleged any requirement to provide Insider with her personal information or to receive emails in exchange for access to Insider.com content, *cf. Yershov*, 820 F.3d at 489, nor that her subscription (whether paid or unpaid) related in whole

---

[16] The non-precedential decision in *Lebakken v. WebMD, LLC*, No. 1:22-cv-644-TWT, 2022 WL 16716151 (N.D. Ga. Nov. 4, 2022) likewise offers Johnson no support: the plaintiff in *Lebbakken* (unlike Johnson) both subscribed to a *video* newsletter *and* "created her own WebMD account," *id.* at *2-3.

or in part to Insider's provision of video content.  Consequently, the claims of the Plaintiffs, who are not "consumers" of video tape service provided by Insider must be dismissed.

IV.    ANY DISCLOSURES INSIDER MADE WERE NOT MADE "KNOWINGLY."

Plaintiffs also fail to adequately allege a knowing disclosure as required by the VPPA. To be liable under the VPPA, a video tape service provider must "knowingly disclose" PII sufficient to identify a consumer and the specific video materials the consumer requested.  18 U.S.C. § 2710(b)(1).  The term "knowingly" connotes actual knowledge.  *See In re Hulu Priv. Litig.,* 86 F. Supp. 3d at 1095.  "It is not enough . . . that a disclosure be merely 'voluntary' in the minimal sense of the defendant's being 'aware of what he or she is doing and . . . not acting because of some mistake or accident.'"  *Id.*

Insider's purported knowledge of its alleged violations is not demonstrated by repeatedly inserting the words "knowingly" or "knew" into individual paragraphs, as Plaintiffs do here. Rather, a plaintiff must "allege *facts* giving rise to a reasonable inference that [Insider] knowingly or willfully disclosed PII to someone other than the consumer."  *Mollett v. Netflix, Inc.*, No. 5:11-cv-01629-EJD, 2012 WL 3731542, at *4 (N.D. Cal. Aug. 17, 2012) (emphasis added), *aff'd*, 795 F.3d 1062 (9th Cir. 2015).  The Complaint does not allege how or why Insider had actual knowledge that Facebook would combine video viewing information with information Facebook otherwise received or had access to from other sources (such as users' web browsers) including an FID.  *Cf.* Facebook Terms of Use (Jan. 4, 2022), *available at* https://www.facebook.com/legal/terms/ update ("[U]sing the Facebook Products covered by these Terms, you agree that we can show you ads that businesses and organizations pay us to promote on and off the Facebook Company-Products . . .  Protecting people's privacy is central to how we've designed our ad system. This means that we can show you relevant and useful ads

*without telling advertisers who you are.*") (emphasis added). Further, although Plaintiffs assert that website operators who use Pixel control what events and information Facebook receives, the Complaint provides no factual support for the allegation that Insider's website implemented any particular event that captured users' video viewing information (¶ 57), nor even that the Pixel was installed.

## V.      PLAINTIFFS' CLAIM FOR UNJUST ENRICHMENT ALSO FAILS.

The Complaint also fails adequately to allege a claim for unjust enrichment.  "[E]ven pleaded in the alternative, claims for unjust enrichment will not survive a motion to dismiss where plaintiffs fail to explain how their unjust enrichment claim is not merely duplicative." *Nelson* v. *MillerCoors, LLC,* 246 F. Supp. 3d 666, 679 (E.D.N.Y. 2017).  Plaintiffs' unjust enrichment claim is entirely derivative of its VPPA claim and so fails for that reason alone.  *See* Compl. ¶ 103 (Insider unjustly enriched "by sharing its digital subscribers' FIDs and viewing content with a third-party, Meta, without first obtaining [consent] . . . as required by the VPPA"). But even were it not, the Complaint pleads no actual facts establishing that Insider profited from its alleged disclosure of video viewing information, for example by linking its advertisements to the videos Plaintiffs watched.  If Insider received no benefit, then there was no enrichment at Plaintiffs' expense requiring restitution.  *See, e.g.*, *In re DoubleClick Inc. Priv. Litig.*, 154 F. Supp. 2d 497, 525 (S.D.N.Y. 2001) (no court has held collecting demographic information "constitutes damage to consumers or unjust enrichment to collectors").

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated:  March 3, 2023

By:  /s/ Dana Brusca

Jeffrey Landis
Dana Brusca
ZWILLGEN PLLC
1900 M Street NW, Suite 250
Washington, DC 20036
Telephone: (202) 296-3585
jeff@zwillgen.com
dana@zwillgen.com

Sheri B. Pan
ZWILLGEN PLLC
183 Madison Avenue, Suite 1504
New York, NY 10016
Telephone: (646) 362-5590
sheri@zwillgen.com

*Counsel for Defendant*

<u>**CERTIFICATE OF SERVICE**</u>

I, Dana Brusca, hereby certify that on this 3rd day of March 2023, this document was electronically filed with the Clerk of the Court using the CM/ECF system, and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

 /s/ Dana Brusca
Dana Brusca