UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re Insider, Inc. Pixel-VPPA Litigation* | Case No. 1:22-cv-06529-AT<br><br>**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Jamie Spritzer and Emma Mendoza (together, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action lawsuit against Insider, Inc. ("Insider" or "Defendant") for violations of the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"). Plaintiffs' claims arise from Defendant's practice of knowingly disclosing its digital subscribers' personally identifiable information and viewed video media (collectively, "Personal Viewing Information") to a third party, Meta Platforms, Inc. ("Meta"). Plaintiffs' allegations are based on personal knowledge as to themselves and their own acts and upon information and belief, including further investigation by Plaintiffs' attorneys as to all other matters.

## SUMMARY OF ALLEGATIONS

1.  This is a consumer digital privacy class action brought on behalf of all persons with Facebook[1] accounts who have digital subscriptions to Insider and have requested or watched videos on www.insider.com,[2] a multimedia website owned and operated by Defendant.

2.  The VPPA prohibits "video tape service providers," such as Insider, from knowingly disclosing consumers' personally identifiable information ("PII"), including "information which identifies a person as having requested or obtained specific video materials or services from a

---

[1] Facebook is owned by Meta Platforms Inc. ("Meta").
[2] As used in this complaint, insider.com or www.insider.com also refer to affiliated websites that require the same login, such as businessinsider.com or www.businessinsider.com.

1

video tape provider," without the person having expressly given consent in a standalone consent form.

3. Insider knowingly discloses its subscribers' PII—including the title of every video they view—to Meta without first obtaining their express consent in a stand-alone consent form that complies with the VPPA's statutory requirements.

4. Insider uses the Meta Pixel to purposely track, record, and transmit its digital subscribers' interactions with www.insider.com to Meta.[3]

5. The Meta Pixel is a snippet of programming code that tracks web visitors as they navigate through a website, including searches, button-clicks, and which links have been clicked on or viewed. The Meta Pixel is installed by Insider, and Insider has full control over which information is tracked and recorded. Resultingly, the Meta Pixel transmits a data packet containing PII, such as the website subscribers' IP address, name, email, or phone number.

6. The information that Insider shares with Meta includes, at a minimum, it's subscribers' Facebook ID ("FID") and the titles of the prerecorded video content that the user requested.

7. A user's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including their name, photos, personal interests, work history, relationship status, and other details.

8. Insider discloses the user's FID and viewing content to Meta together in a single, unencrypted transmission, in violation of the VPPA. Because the user's FID uniquely identifies an individual's Facebook account, which in turn identifies them, Meta—or any other ordinary person—can use the Facebook ID to quickly and easily locate, access, and view the user's corresponding Facebook profile. In the simplest terms, Insider's use of the Meta Pixel allows Meta

---

[3] Insider also uses other tools for this purpose, such as first-party and third-party cookies, software development kits ("SDK"), and Facebook's Business Tools, including Advanced Matching and Conversion API.

to know what video content its users viewed on its website.

9. Insider users do not consent to such sharing through a standalone consent form, as required by the VPPA. As a result, Insider violates the VPPA by disclosing this information to Meta.

10. On behalf of a Class of similarly situated Insider users, Plaintiffs seek relief through this action. Based on the facts set forth in this Complaint, Insider violated the VPPA and is liable for unjust enrichment.

## PARTIES

*Plaintiffs*

11. Plaintiff **Jamie Spritzer** is a citizen and resident of Roslyn Heights, New York.

12. Plaintiff **Emma Mendoza** is a citizen and resident of La Porte, Texas.

*Defendant*

13. Defendant Insider is a Delaware corporation headquartered at 1 Liberty Plaza, 8th Floor New York, NY 10006.

## JURISDICTION AND VENUE

14. This Court has original jurisdiction under 28 U.S.C. § 1331 based on Plaintiffs' claims under the Video Privacy Protection Act, 18 U.S.C. § 2710.

15. This Court also has subject matter jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because this is a proposed class action in which: (1) there are at least 100 Class members; (2) the combined claims of Class members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs; and (3) Defendant and at least one Class member are domiciled in different states.

16. This Court has general personal jurisdiction over Insider because it maintains its principal place of business in New York. Additionally, Insider is subject to specific personal

jurisdiction in this State because it maintains sufficient minimum contacts with the State of New York and a substantial part of the events and conduct giving rise to Plaintiffs' claims occurred in this state.

17. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## PLAINTIFF-SPECIFIC ALLEGATIONS

### Jamie Spritzer

18. Plaintiff Spritzer is a subscriber to the Insider Intelligence "Banking & Payments Daily" newsletter, which is a weekly newsletter that provides its subscribers with emails relating to content, such as banking, fintech, and payments.

19. Plaintiff Spritzer subscribed to the Insider Intelligence newsletter by providing her PII, including her email address.

20. During the class period, Plaintiff Spritzer accessed www.insider.com from her web browser and used the subscription to view prerecorded video content on multiple occasions.

21. Plaintiff Spritzer has maintained a Facebook account for approximately 10 years and uses the account daily. Plaintiff Spritzer's Facebook profile includes personal information about her, including her name and other personal details.

22. Plaintiff Spritzer requests and watches prerecorded videos on Insider using the same device and browser that she uses to login to Facebook, including while she is logged in to Facebook.

23. Insider sent to Meta Plaintiff Spritzer's PII, including her FID, as well as the title of each prerecorded video she viewed without obtaining consent through a standalone consent form. Additionally, she has seen targeted advertisements on Facebook after watching related videos on www.insider.com.

**Emma Mendoza**

24. Plaintiff Mendoza has an Insider digital subscription.

25. Plaintiff Mendoza registered for her account and Defendant's services by providing her PII, including her name and email address.

26. During the class period, Plaintiff Mendoza viewed prerecorded video content on Defendant's website on multiple occasions.

27. Plaintiff Mendoza has maintained a Facebook account since approximately 2015 and uses the account daily. Plaintiff Mendoza's Facebook profile includes personal information about her, including her name and other personal details.

28. Plaintiff Mendoza requests and watches prerecorded videos on Insider approximately one to two times per week using the same device and browser that she uses to login to Facebook, including while she is logged in to Facebook.

29. Insider sent Plaintiff Mendoza's PII to Meta, including her FID, as well as the title of each prerecorded video she viewed, without obtaining consent through a standalone consent form.

30. As a result of the systematic process described in this Complaint, each Plaintiff's privacy rights, including under the VPPA, were violated.

**COMMON ALLEGATIONS**

A. **Background of the Video Privacy Protection Act**

31. The VPPA prohibits the knowing disclosure of a consumer's video-watching preferences without the informed, written consent of the customer in a form "distinct and separate from any form setting forth other legal or financial obligations." Under the statute, the Court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief and attorney's fees.

32. The VPPA was initially passed in 1988 for the explicit purpose of protecting the

privacy of individuals' and their families' video rental, purchase and viewing data. Leading up to its enactment, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." S. Rep. No. 100-599 at 6-7 (1988).

33. Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7 (1988) (statements of Sens. Simon and Leahy, respectively).

34. In proposing the Video and Library Privacy Protection Act (later codified as the VPPA), Senator Leahy stated that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988). Thus, the personal nature of such information, and the need to protect it from disclosure, is the inspiration of the statute: "[t]hese activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id*.

35. While these statements rang true in 1988 when the VPPA was passed, the importance of legislation like the VPPA in the modern era of data mining from online activities is more pronounced than ever before. During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we

6

must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."

36. In this case, Insider violated Plaintiffs' and Class members' privacy rights by systematically disclosing their Personal Viewing Information to Meta without obtaining appropriate consent in a manner that complies with the VPPA's statutory requirements.

### B. Insider is a "Video Tape Service Provider," and its subscribers are "Consumers" under the VPPA

37. Insider is a multimedia organization that provides national and international news, entertainment, and social commentary, all of which is featured on its website and available to its digital subscribers. Just like "department store[s]," "golf shop[s]," and "continuity club[s],"[4] which the VPPA's legislative history identifies as potential video tape service providers, Insider is a video tape service provider because it creates, hosts, and disseminates thousands of videos on www.insider.com, and a section of its website is dedicated to video content.

38. Defendant places advertisements alongside its pre-recorded video content and embeds commercials within its video playlists. Thus, Defendant uses these videos as a means of increasing its revenue through advertisements, and benefits from sharing users PII and viewing content in violation of the VPPA.

### C. Defendant Knowingly Disclosed Subscribers' PII to Meta

39. Defendant knowingly disclosed its subscribers' PII to Meta through use of the Metal Pixel and Facebook business tools, including Advanced Matching and Conversion API.

40. The Meta Pixel and related Facebook business tools are invisible to website users and consumers.

41. Meta gives website operators, such as Defendant, control over the categories of

---

[4] See S. Rep. 100-599, at 12-13.

information and data their website tracks, records, and sends to Meta. Defendant's knowledge of its conduct is evidenced by the fact that it: (1) chose to track its digital subscribers' interactions with insider.com, including the prerecorded videos they viewed; (2) requested and obtained code from Meta in order to achieve this purpose; and (3) installed those lines of code on insider.com without adding a standalone consent form as required by the VPPA.

   **D.**  **Insider's Digital Subscriptions**

   42.  To subscribe to Defendant's newsletter and other services, at a minimum, users must provide personal information, including their email address. Some users pay for their subscriptions in exchange for receiving additional content. On information and belief, all digital subscribers also provide their IP address, which informs Defendant as to the subscribers' city, zip code, and physical location.

   43.  Digital subscribers may also provide to Defendant the identifier on their mobile devices and/or cookies stored on their devices.

   44.  Plaintiffs and Class members neither knew of nor authorized, nor otherwise consented to Defendant sharing Personal Viewing Information with third parties, such as Meta.

   45.  Defendant never obtained its digital subscribers' written consent to collect their Personal Viewing Information "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer," as the VPPA requires. Accordingly, none of Insider's digital subscribers provided Insider with the level of consent required by the VPPA for disclosure of their viewing content and identities to Meta.

   **E.**  **Insider Uses the Meta Pixel**

   46.  Businesses, such as Insider, use Facebook's business tools, including tracking pixels, to monitor and record their website visitors' devices and activities on their website. As a result, website visitors' browsing data and interactions with a particular website are sent to Meta, which uses the information for marketing purposes.

47. The Meta Pixel and related tools are invisible to ordinary consumers, and Meta's advertising partners, including Insider, control which actions are recorded and reported to Meta.

48. To obtain the code for the Pixel, the website advertiser tells Meta which website events it wants to track (e.g., video views and button clicks) and Meta provides corresponding Meta Pixel code for the advertiser to incorporate into its website.

49. When an Insider digital subscriber enters the website and views video media, that information is automatically sent to Meta via the Meta Pixel Insider incorporated into its web code. The information that is transmitted identifies the visitor by their FID ("FID" or "c_user")[5] and is sent with the name of the video content they viewed.

50. Digital subscribers' Personal Viewing Information is sent to Meta in one transmission—allowing Meta or any other ordinary person to make a direct connection between individuals and their viewed video content.

51. The ability to easily identify any individual by using their unique FID is not limited to Facebook. Any ordinary person who comes into possession of an FID can easily use that information to identify a particular individual, and Meta admits as much on its website.

52. Ordinary persons who come into possession of the FID can connect to any Facebook profile, which may contain information such as a Facebook user's name, gender, birthday, place of residence, career, educational history, a multitude of photos, and the content of a Facebook user's posts, by simply visiting www.facebook.com/[the user's FID]. This information may reveal even more sensitive personal information—for instance, posted photos may disclose the identity of family members, and written posts may disclose religious preferences, political affiliations, personal interests and more. Simply put, with only an FID and the video content name and URL—all of which Defendant knowingly and readily provides to

---

[5] The FID is a unique and persistent identifier, comprised of a string of numbers, that Facebook assigns to each user when they create their account. With it, any ordinary person can look up the user's Facebook profile and name.

9

Meta—any ordinary person could learn the identity of a particular digital subscriber and the specific video or media content they requested on insider.com.

53. In addition, the Personal Viewing Information Defendant disclosed to Meta allows Meta to build from scratch or cross-reference and add to the data it already has in its own detailed profiles for its own users, adding to its trove of personally identifiable data.

54. Insider benefits from its use of the Meta Pixel because it provides Insider with analytical data about its website and digital subscribers, allowing Insider to improve the manner in which it promotes content and services. For instance, the data collected through the Meta Pixel is provided to Insider in Meta's Events Manager, as well as tools and analytics to reach individual digital subscribers through Facebook ads. Insider can also use this information to create "custom audiences" through Meta to help it target specific digital subscribers and other Facebook users who match Insider's custom audience criteria. Insider can sort through the data to find specific types of users including, for instance, women over a certain age, in a certain location, with certain interests. Insider also profits from selling parts of its website to display advertisers.

55. Defendant knew it was collecting this data and sending it to Meta, and yet it failed to request or obtain its digital subscribers' written consent, in a distinct and separate consent form, prior to these disclosures.

56. The Meta Pixel is not necessary for Defendant to operate www.insider.com. Rather, its sole purpose and function is to enrich Defendant's advertising and marketing efforts. Even if Insider finds it useful for other purposes, it could have used the Meta Pixel without violating the VPPA by simply adhering to the statute's consent requirements. Moreover, even Meta forbids the disclosure of such information because it requires its advertising partners to comply with relevant federal and state laws, including the VPPA.

F. **Plaintiffs and Class Members Were Harmed by Insider's Privacy Violations**

57. Insider shared Plaintiffs' sensitive data with Meta, including their prerecorded

video viewing histories, which Plaintiffs reasonably expected would be kept private.

58. The personal information Insider obtained from Plaintiffs and Class members constitutes valuable data in the digital advertising-related market for consumer information. Insider's wrongful acquisition and use of their personal, private information deprived Plaintiffs and Class members of control over that information and prevented them from realizing its full value for themselves.

59. Insider's conduct has resulted in economic harm to Plaintiffs and Class members whose PII diminished in value when Insider made this information available to Meta.

60. The harms described above are aggravated by Insider's continued retention and commercial use of Plaintiffs' and Class members' personal information, including their private video viewing histories.

## CLASS ALLEGATIONS

61. Plaintiffs bring this lawsuit under Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), and/or (c)(4) as representatives of the following Class:

> **Nationwide Class**: All persons in the United States who subscribed to insider.com, viewed prerecorded content on insider.com, and used Facebook during the time Meta's Pixel was active on insider.com.

62. The "Class Period" is from January 1, 2013 to the present.

63. Plaintiffs reserve the right to modify, change, or expand the Class definition based upon discovery and further investigation.

64. Excluded from the Class are (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which Insider or their parents have a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendant's counsel.

11

65. **Numerosity**: The Class consists of at least hundreds of thousands of individuals, making joinder impractical.

66. **Commonality and Predominance**: Common questions of law and fact exist with regard to each of the claims and predominate over questions affecting only individual Class members. Questions common to the Class include, but are not limited to:

    a. Whether Insider's use of the Meta Pixel was without user consent or authorization;

    b. Whether Insider obtained and shared or caused to be obtained and shared Plaintiffs' and Class members' personal information through tracking using Meta Pixel, which Insider installed on its webpages;

    c. Whether other third parties obtained Plaintiffs' and Class members' personal information as a result of Insider's conduct described herein;

    d. Whether Insider's conduct violates the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.*;

    e. Whether Insider was unjustly enriched as a result of sharing users' information with Meta;

    f. Whether Insider's acquisition and transmission of Plaintiffs' and Class members' personal information resulted in harm; and

    g. Whether Insider should be enjoined from engaging in such conduct in the future.

67. **Typicality**: Plaintiffs' claims are typical of the claims of Class members in that Plaintiffs, like all Class members, have been injured by Insider's misconduct—disclosing users' PII and viewing content to Meta without consent.

68. **Adequacy of Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions, including privacy protection cases. Plaintiffs do not have any interests antagonistic to those of the Class.

69. **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class-wide damages are essential to induce Insider to

comply with federal law. Moreover, because the amount of each individual Class member's claim is small relative to the complexity of the litigation, and because of Insider's financial resources, Class members are unlikely to pursue legal redress individually for the violations detailed in this complaint. A class action will allow these claims to be heard where they would otherwise go unheard because of the expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

70. **Injunctive relief**: Insider has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole.

## TOLLING OF THE STATUTES OF LIMITATIONS

71. All applicable statute(s) of limitations have been tolled by Insider's knowing and active concealment and denial of the facts alleged herein.

72. As alleged herein, Meta Pixel is a snippet of code not apparent to consumers from the Insider website. Plaintiffs were therefore unaware of Insider's misconduct.

73. Plaintiffs and Class members could not have reasonably discovered Insider's practices of sharing their personal viewing content and PII with Meta until shortly before this class action litigation commenced.

74. Insider was and remains under a continuing duty to disclose to Plaintiffs and Class members its practice of sharing personal viewing content and PII to Meta. As a result of the active concealment by Insider, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT
### (VIDEO PRIVACY PROTECTION ACT)
### 18 U.S.C. § 2710, *et seq.*

75.     Plaintiffs incorporate and reallege the above factual allegations by reference.

76.     The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally-identifying information" concerning any consumer to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

77.     As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials." Insider is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it engaged in the business of delivering audiovisual materials—including the prerecorded videos that Plaintiffs viewed—that are similar to prerecorded video cassette tapes and those deliveries affect interstate or foreign commerce.

78.     As defined in 18 U.S.C. § 2710(a)(3), "personally identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

79.     Insider knowingly caused Plaintiffs' and Class member' personal viewing information, including FIDs, to be disclosed to Meta. This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified each Plaintiff and Class member to Meta as an individual who viewed Insider's content, including the specific prerecorded video materials watched on Insider's website. This information allowed Meta to identify each Plaintiff's and Class Member's specific individual video-viewing preferences and habits.

80.     As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser,

14

or subscriber of goods or services from a video tape service provider." Plaintiffs are digital subscribers of Insider's services which provides video content to users on its website. Plaintiffs viewed prerecorded videos on www.insider.com. Thus, Plaintiffs are "consumers" under this definition.

81. As set forth in 18 U.S.C. § 2710(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or is given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner. Insider failed to obtain informed, written consent under this definition.

82. Additionally, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). The Act requires video tape service providers to "provide[] an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Insider failed to provide an opportunity to opt out as required by the Act.

83. Insider was aware that the disclosures to Meta that were shared through the Meta Pixel identified Plaintiffs and Class members. Insider also knew that Plaintiffs' and Class members' personal viewing content was disclosed to Meta because Insider programmed the Meta Pixel into its website code knowing that Meta would receive video titles and the subscriber's FID when a user watched a prerecorded video.

84. By knowingly disclosing Plaintiffs' and Class members' personal viewing content, Insider violated Plaintiffs' and Class members' statutorily protected right to privacy in their video-watching habits. *See* 18 U.S.C. § 2710(c).

85. As a result of the above violations, Insider is liable to Plaintiffs and Class members

for actual damages related to their loss of privacy in an amount to be determined at trial or, alternatively, for "actual damages but not less than liquidated damages in an amount of $2,500" per violation. 18 U.S.C. § 2710(c)(2)(A). Under the Act, Insider is also liable for reasonable attorney's fees, other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury and sufficient to prevent and deter the same or similar conduct by Insider in the future.

## SECOND CLAIM FOR RELIEF
## UNJUST ENRICHMENT

86. Plaintiffs incorporate and reallege the above factual allegations by reference.

87. Insider acted wrongfully by sharing its digital subscribers' FIDs and viewing content with a third-party, Meta, without first obtaining their express consent through a standalone consent form, as required by the VPPA.

88. Insider's practice of sharing users' personal information and viewing content with Meta without proper consent, along with its failure to disclose this practice, caused Insider to profit from advertisement revenue it would otherwise not have received.

89. Insider's retention of these ill-gotten gains is unjust and inequitable.

90. Accordingly, Plaintiffs, individually and on behalf of the Class, seek restitution, restitutionary disgorgement, and all other appropriate relief permitted by the law of unjust enrichment. There is no adequate remedy at law that would provide redress to Plaintiffs and the Class or ensure that Insider will not deploy the same data practices in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court:

A. Certify this case as a class action, and appoint Plaintiffs as Class Representatives and the undersigned attorneys as Class Counsel;

B. Enter judgment in favor of Plaintiffs and the Class;

C. Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiffs and Class members, including reformation of practices and an accounting and purging of wrongfully obtained personal information;

D. Award all actual, general, special, incidental, statutory, treble, punitive, liquidated, and consequential damages and/or restitution to which Plaintiffs and Class members are entitled;

E. Award disgorgement of monies obtained through and as a result of the wrongful conduct alleged herein;

F. Award Plaintiffs and Class members pre- and post-judgment interest as provided by law;

G. Enter such other orders as may be necessary to restore to Plaintiffs and Class members any money and property acquired by Defendant through its wrongful conduct;

H. Award Plaintiffs and Class members reasonable litigation expenses and attorneys' fees as permitted by law; and

I. Award such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues triable as of right.

Dated: June 28, 2023                                                Respectfully submitted,

*/s/ Philip L. Fraietta*
Philip L. Fraietta
Joshua D. Arisohn
**BURSOR & FISHER, P.A.**
1330 Avenue of the
Americas, 32nd Floor
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: jarisohn@bursor.com

pfraietta@bursor.com

Christopher R. Reilly*
**BURSOR & FISHER, P.A.**
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Tel: (305) 330-5512
Fax: (305) 679-9006
E-Mail: creilly@bursor.com

Christian Levis
Amanda Fiorilla
**LOWEY DANNENBERG, P.C.**

44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com

Adam E. Polk (admitted *Pro Hac Vice)*
Simon Grille (admitted *Pro Hac Vice)*
Kimberly Macey (admitted *Pro Hac Vice)*
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
apolk@girardsharp.com
sgrille@girardsharp.com
kmacey@girardsharp.com

Gary M. Klinger (admitted *Pro Hac Vice)*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Telephone: (866) 252-0878
gklinger@milberg.com

Nick Suciu III (admitted *Pro Hac Vice)*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Tel: (313) 303-3472
Fax: (865) 522-0049
nsuciu@milberg.com

*Attorneys for Plaintiffs*

*\*Pro Hac Vice Forthcoming*